UNITED STATES DISTRICT COURT　　　　　　　FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
MARILYN SYBALSKI and PAUL SYBALSKI, :
individually and as legal guardians of the person :
and property of PAUL SYBALSKI, II, :
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Plaintiffs,　　　　　　　　　　　: 　　MEMORANDUM
　　　　　　　　　　　　　　　　　　　　　　　　: 　　AND ORDER
　　　- against -　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　: 　　06 CV 4899 (JG)
INDEPENDENT GROUP HOME LIVING　　　　　　:
PROGRAM, INC., WALTER STOCKTON,　　　　　　:
LISA LOMBARDI, WILLIAM HERRICK,　　　　　　:
THOMAS TRAKOVAL and CHANELLE　　　　　　:
SPRUILL,　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Defendants.　　　　　　　　　　:
---------------------------------------------------------------- X

A P P E A R A N C E S :

　　　WOLIN & WOLIN
　　　　　　420 Jericho Turnpike, Suite 215
　　　　　　Jericho, NY 11753
　　　By:　　Alan E. Wolin
　　　　　　Attorneys for Plaintiffs

　　　COOPER, SAPIR & COHEN, P.C.
　　　　　　560 Broadhollow Road
　　　　　　Suite 210
　　　　　　Melville, NY 11747
　　　By:　　David M. Cohen
　　　　　　Attorneys for Defendants

JOHN GLEESON, United States District Judge:

　　　　　Marilyn and Paul Sybalski ("the Sybalskis") bring this civil rights action pursuant

to 42 U.S.C. § 1983[1] on behalf of themselves and their son ("Paul"), a mentally disabled young

---

[1]　　　That statute provides:

　　　Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State
　　　or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the
　　　United States or other person within the jurisdiction thereof to the deprivation of any rights,

man living at an independent group home owned and operated by Independent Group Home Living Program, Inc. The Sybalskis claim the defendants (collectively, "the Home") restricted their telephone calls and visits with Paul because of their frequent complaints about Paul's care. This conduct, plaintiffs argue, violated the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§ 10801-10851, ("PAIMI")[2] and New York law. On December 29, 2006, I denied plaintiffs' motion for preliminary injunctive relief. The Home now moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Sybalskis' federal claims for want of state action. Oral argument was held on April 13, 2007. For the reasons set forth below, the motion is granted and the complaint dismissed.

BACKGROUND

According to the complaint, the Sybalskis were not shy about critiquing Paul's treatment at the Home. Twenty-three cited letters, written between July 10, 2004 and March 1, 2006, "are merely illustrative." Compl. ¶ 36, ¶¶ 37-59. The letters accused the Home of a wide array of neglectful, offensive, abusive, illegal, and unsafe acts. The Sybalskis also expressed their concerns about Paul's care in person during their visits to the Home. In response, the Home issued, by letter, a series of restrictions on the Sybalskis' ability to telephone and visit with Paul. An August 31, 2004 letter by defendant Trakoval stated that only program

---

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

[2] Plaintiffs refer to PAIMI by its old title, the "Protection and Advocacy for Mentally Ill Individuals Act of 1986." *See* Compl. ¶ 84. Congress amended the title in 2000. *See Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 233 n.1 (2d Cir. 2006).

2

management staff could receive the Sybalskis' telephone calls; limited the time, duration, and subject matter of those calls; provided that in-person visits by the Sybalskis required 24 hours notice to the Home; and restricted the time and nature of the visits. A March 1, 2006 letter by defendant Lombardi imposed further restrictions: visits could take place only on weekends by prearranged appointment and under supervision of Home officials, who reserved the right to terminate the visits. A May 26, 2006 letter by Lombardi imposed even more (unspecified) restrictions on visitation and telephone calls. The upshot is that now the Sybalskis are unable "to obtain any information, whatsoever, about their son." *Id.* ¶ 67.

The Home is a private entity.[3] Nevertheless, it is subject to various certification and licensing requirements of the New York Mental Hygiene Law ("MHL") and regulations promulgated thereunder, and New York "may provide State aid for the operation of the home." *Id.* ¶ 29. In addition, state law regulates the Home's ability to limit the rights of its mentally disabled residents, including the right to "receive visitors at reasonable times, to have privacy when visited, and to communicate freely with persons within or outside the facility," N.Y. Mental Hyg. Law § 33.02(a)(9), and the right to "bring any questions or complaints," *id.* § 33.02(a)(12). The Home may not limit those rights "as a punishment or for the convenience of staff," and

> [a]ny limitation . . . shall be permitted . . . only upon written order by the director
> or chief executive officer [of the Home] upon receipt of a recommendation by the

---

[3] Plaintiffs claim that the Home "assumed ownership and operation of the group home from the State of New York." Pl. Br. 2. At oral argument, plaintiffs' counsel indicated that he did not have access to the contract or proposal by which this transfer of ownership was effected. Counsel for defendants has indicated that "no such documents exist," because the predecessor in interest was not the state but "another not-for-profit agency, Developmental Disabilities Institute." Letter of David M. Cohen 1, Apr. 13, 2007. Counsel represented that New York took over operation of the group home after that non-profit filed for Chapter 11 bankruptcy. *Id.* I have no reason not to credit these representations by the Home's counsel. In any event, whether the Home succeeded New York as the owner and operator of the group home at issue does not affect my decision.

3

> treating practitioner . . . with such order to be placed in the resident's clinical record stating the clinical justification for such limitation and the specific period of time such limitation shall remain in effect.

*Id.* § 33.02(b).

## DISCUSSION

The Home's Rule 12(b)(6) motion tests the legal sufficiency of the Sybalskis' complaint. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)) (prior citations omitted)). Accordingly, I accept as true the factual allegations I have mentioned, and draw all inferences in the Sybalskis' favor.[4] *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994), *cert. denied*, 513 U.S. 816 (1994). I may not grant the Home's motion to dismiss unless it appears beyond doubt that the Sybalskis can prove no set of facts that would entitle them to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).

The Home argues that its restrictions on the Sybalskis' telephone calls and visits cannot support a § 1983 claim because the challenged conduct was not state action, that is, action

---

[4] In my December 29, 2006 ruling on plaintiffs' motion for a preliminary injunction, I made certain findings of fact for the purposes of that decision. Obviously, those findings of fact are outside the scope of the Rule 12(b)(6) challenge before me.

4

"under color of" law. The Sybalskis do not allege that the Home is a government actor; rather, they argue that the ostensibly private decision of the Home to restrict the Sybalskis' communications with Paul was state action for purposes of their § 1983 claim.

The Fourteenth Amendment does not regulate private action. *See The Civil Rights Cases*, 109 U.S. 3, 11 (1883); *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948) ("Since the decision of this Court in the *Civil Rights Cases*, [*supra*], the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."). Consequently, § 1983 actions brought to enforce constitutional requirements cannot ordinarily proceed against a private actor. *See United States v. Price*, 383 U.S. 787, 794 n.7 (1966) ("In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment."). At the same time, however, a state may not shield itself from constitutional tort liability by formally delegating the execution of its policies to private actors; as the Supreme Court has recognized, "if formalism were the sine qua non of state action, the doctrine would vanish owing to the ease and inevitability of its evasion." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 301 n.4 (2001). *Cf. Evans v. Newton*, 382 U.S. 296, 301-02 (1966) (private trustees appointed to replace municipality trustee of segregated public park are not private actors). The difficulty lies in determining "'when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.'" *Brentwood*, 531 U.S. at 295 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)) (italics omitted).

The Second Circuit has summarized the sorts of nominally private actions that have been found to be state action:

> A challenged activity by a private entity may be deemed state action when the state exercises "coercive power," is "entwined in [the] management or control" of the private actor, or provides the private actor with "significant encouragement, either overt or covert," or when the private actor "operates as a willful participant in joint activity with the State or its agents," is "controlled by an agency of the State," has been delegated a "public function" by the state, or is "entwined with governmental policies."

*Cranley v. Nat'l Life Ins. Co.*, 318 F.3d 105, 112 (2d Cir. 2003) (quoting *Brentwood*, 531 U.S. at 296). The Sybalskis argue that the nominally private restrictions imposed upon them by the Home were, in the eyes of the law, the actions of state actors because the facts, as alleged, reflect that (1) New York exercised coercive power or significant encouragement in the Home's alleged conduct, (2) the Home and the state had a "close nexus," and (3) the Home has been delegated a public function. Pl. Br. 9.

The first two arguments lack any merit. The complaint makes no allegation that the State of New York directly participated in the decision to restrict the Sybalskis' communications with Paul. Nor does it allege that the decision was so governed by state regulation as to be properly attributed to the state: the MHL merely establishes a procedure by which the Home must execute its decisions. The Supreme Court held in *Blum v. Yaretsky*, 457 U.S. 991 (1982), that a nursing home's decision to transfer certain residents to lower levels of care was not state action, even though the decision was procedurally regulated by a state-mandated form, because the home's "physicians, and not the forms, make the decision about whether a patient's care is medically necessary." 457 U.S. at 1006. And in *Okunieff v. Rosenberg*, 996 F. Supp. 343 (S.D.N.Y. 1998), *aff'd*, 166 F.3d 507 (2d Cir. 1999), *and cert.*

6

*denied*, 528 U.S. 1144 (2000), the district court concluded that a private hospital's decision to commit a psychiatric patient against her will was not state action, because while the MHL mandates that two physicians must certify such a decision and consider alternative forms of treatment, in the end "the private physicians employed medical judgment based on standards accepted in the medical community when rendering their decision." 996 F. Supp. at 350. Similarly, in this case, the MHL mandates a procedure for the Home to execute its decision to limit a resident's communication and visits with outside persons or a resident's ability to bring complaints: it requires a "recommendation" by a treating doctor and a specific type of "written order" by a Home official placed in the resident's record. N.Y. Mental Hyg. Law § 33.02(b). But the MHL contemplates that the substantive decision to impose the restrictions will be based upon a "clinical justification." *Id.* The decision thus "ultimately turn[s] on medical judgments made by private parties according to professional standards that are not established by the State," and therefore is not properly attributable to that state.[5] *Blum*, 457 U.S. at 1008.

That the Home is subject to state regulation, and receives state funding, does not, without more, allege sufficient participation by the state in the decision at issue to rise to the level of state action. *See id.* at 1010-11 (no state action despite extensive state subsidy and licensing of nursing homes); *Rendell-Baker v. Kohn*, 457 U.S. 830, 840-41 (1982) (discharge by non-profit, privately operated school subject to extensive general regulations and state subsidies was not state action); *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 n.7 (1974) ("If

---

[5] In addition, the statute indicates that the Home has some independent discretion to directly curtail certain of the rights at issue. *See id.* § 33.02(a)(9) (defining the right of residents to "receive visitors at *reasonable times*") (emphasis added); *id.* § 33.02(a)(13) (defining the right of residents to "authorize those family members and other adults who will be given priority to visit *consistent with the patient's ability to receive visitors*") (emphasis added).

the mere existence of this regulatory scheme made Metropolitan's action that of the State, then presumably the actions of a lone Philadelphia cab driver could also be fairly treated as those of the State of Pennsylvania."). And the complaint does not allege that the Home's administration or governance was "entwined" with that of the state. *Compare Brentwood*, 531 U.S. at 301 (ostensibly private athletic association was state actor because its member representatives were overwhelmingly public school officials, state officials served as ex officio board-members, and association employees received state benefits).

The Sybalskis' strongest argument is that, in caring for mentally disabled persons, the Home has been delegated a public function. A line of cases, in this circuit and elsewhere, hold that "private facilities that undertake to provide required public services" are state actors. *Vega v. Fox*, 457 F. Supp. 2d 172, 185 (S.D.N.Y. 2006). In *Vega*, the district court denied summary judgment on whether the failure of a private home for young adults to intervene in an assault by one resident against another was state action, in part because "a material question of fact" existed "as to entwinement," but also because the home provided public services. *Id.* Courts have reached the same conclusion about non-state facilities operating under the MHL. *See, e.g.*, *Kasunic v. Webb*, No. 89 CIV. 6802 (JFK), 1990 WL 104005, at *5 (S.D.N.Y. July 16, 1990) (denying summary judgment on whether licensed corporate operators of residential care programs for mentally disabled persons were state actors in part because "with the revision of the MHL the State undertook to insinuate itself into 'reshaping' New York's mental health programs, indicating that mental health programs are now within the power, control and supervision of the State"); *Ruffler v. Phelps Mem'l Hosp.*, 453 F. Supp. 1062, 1070 (S.D.N.Y. 1978) (involuntary hospitalization by private hospital was state action because of "New York

8

State's explicit assumption of governmental responsibility for mental health care, [a]nd its extensive statutory regulation of the terms of civil commitment of the mentally disabled"). *Cf. Flowers v. Webb*, 575 F. Supp. 1450, 1454 (E.D.N.Y. 1983) (acts and omissions of center operated by City of New York were attributable to New York State because the state had adopted through the MHL "substantial responsibility for overseeing and regulating the administration of services provided to mentally disabled patients in [City] facilities"); *Fialkowski v. Greenwich Home for Children, Inc.*, 683 F. Supp. 103, 105 (E.D. Pa. 1987) (state action sufficiently alleged by claim that Pennsylvania had "assumed a duty to provide custody, care, and habilitation services . . . to its mentally retarded citizens" and had delegated that duty to the defendant).

This line of cases, it appears to me, runs contrary to the Supreme Court's test for whether a non-state entity's adoption of a "public function" renders the entity's decision state action. The Court in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352-53 (1974), rejected the argument that a privately owned and operated utility company, because it "provides an essential public service required to be supplied on a reasonably continuous basis," performed a "public function" for state action purposes. The Court made clear that the proper test is whether a private entity has exercised "powers traditionally exclusively reserved to the States." 419 U.S. at 353. Accordingly, the Court has found state action in delegated powers "traditionally associated with sovereignty, such as eminent domain." *Id.*; *Nixon v. Condon*, 286 U.S. 73 (1932) (elections); *Marsh v. Alabama*, 326 U.S. 510 (1946) (company town); *West v. Atkins*, 487 U.S. 42 (1988) (medical treatment of prisoners); *see also Janusaitis v. Middlebury Volunteer Fire Dept.*, 607 F.2d 17 (2d Cir. 1979) (fire protection). As *Jackson* illustrates, the mere fact that a

9

private entity's public function is "essential" does not make the entity a state actor.

Accordingly, it is not sufficient that the Home "has assumed the State's duty and obligation to protect . . . and to provide custody, care and habilitation services to mentally retarded citizens." Pl. Br. 10. For the Home's actions to be state actions, the protection of and care for the mentally disabled must be functions traditionally and exclusively reserved to the state. The decision in *Okunieff*, which was affirmed by the Second Circuit, has already answered this question in the negative. While analyzing the related question whether involuntary treatment and confinement of the mentally ill was state action, Judge Sweet found that "[s]ince the beginning of the United States, families, friends, and guardians have cared for the mentally ill privately;" that "[i]n New York, there seems to have been little early legislation in reference to the mentally ill, and if they were dependent, they were probably classed among the poor;" and that "[t]he care of the mentally ill . . . was not recognized as a public duty, except insofar as it sought to protect the public from violent persons." 996 F. Supp. at 355-56. Recent cases in this circuit have approved this conclusion. *See Doe v. Harrison*, 254 F. Supp. 2d 338, 343 (S.D.N.Y. 2003) (adopting the *Okunieff* analysis); *Monaco v. Stone*, No. CV-98-3386, 2002 WL 32984617, *27 (E.D.N.Y. Dec. 20, 2002) (same). Judge Sweet's thoughtful historical analysis of care for the mentally ill in New York covers the mentally disabled as well. *See Okunieff*, 996 F. Supp. at 356 (citing secondary sources about the mentally ill and the mentally disabled). I therefore conclude that care for the mentally disabled was neither traditionally nor exclusively reserved to the state. Accordingly, I conclude that the Home's adoption of this function does not make its decisions in this regard properly attributable to the state.

Defendants' motion to dismiss plaintiffs' federal claims is granted.[6] I decline to exercise supplemental jurisdiction over the remaining state-law claims. The complaint is therefore dismissed.

So ordered.

John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
April 24, 2007

---

[6] Plaintiffs claim the Home violated PAIMI and "thereby violated 42 U.S.C. § 1983," Compl. ¶¶ 84-85. But while § 1983 may be used to enforce the rights guaranteed by certain federal statutes, *see Maine v. Thiboutot*, 448 U.S. 1, 4 (1980), PAIMI is not such a statute. Its "precatory language" creates no privately enforceable federal rights. *See Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987 (1st Cir. 1992). The PAIMI claim is therefore dismissed as well.